ANNA K. GILMAN, by FRAZIER GILMAN, Guardian, in Equity,

*vs.*

CHARLES T. HAVILAND, et als.

Kennebec. Opinion December 28, 1915.

*Demurrer.    Guardian.    Judgment.    Mortgage.    Sale.    Sheriff's Deed.*

Bill in Equity to have a certain sale of real estate on execution, made November 20, 1889, declared void and set aside on the alleged ground that the judgment debtor was of unsound mind and incapable of managing her own affairs at the time and was not represented in the proceedings by any guardian.

The case was heard upon the merits before the Justice below, and on November 24, 1914, he filed a decree dismissing the bill for the reasons stated in his findings of fact filed with the decree and referred to therein. From that decree the plaintiff appealed.

*Held:*

1. The decision of a single Justice upon matters of fact in an equity hearing should not be reversed unless it clearly appears that such decision is erroneous, and the burden of proving the error rests on the appellant.

2. Public policy requires that the judgments and orders of courts and the sales of property thereunder should not be lightly vacated and set aside upon a claim that the parties thereto were of unsound mind at the time they were rendered, especially after the lapse of more than a score of years during which time other parties have acquired rights in the property involved. Such a claim must be established by proof that is clear and convincing.

3. The conclusion of the court upon the whole evidence is that it does not appear that the decision of the sitting Justice dismissing the bill on the merits was erroneous.

Bill in equity. On appeal by plaintiff. Appeal dismissed. Decree below affirmed.

This bill in equity was brought for Anna K. Gilman by Frazier Gilman, her guardian, to set aside a sheriff's sale to defendant Charles T. Haviland of property belonging to Anna K. Gilman. At the hearing of the cause before the sitting Justice, the bill was dismissed. From this decision the plaintiff appealed.

The case is stated in the opinion.

*Johnson & Perkins, and A. K. Butler,* for plaintiff.

*H. D. Eaton,* for defendant Haviland.

*F. W. Clair,* for Belle and Chas. Gilman.

*John E. Nelson,* for widow of D. P. Foster and the guardian of his minor children.

*A. H. Bridges,* for H. M. Fuller and B. F. Towne.

SITTING: SAVAGE, C. J., KING, BIRD, HALEY, HANSON, JJ.

KING, J. Bill in equity, on appeal by plaintiff.

The first bill in this case was filed February 27, 1908, in which Charles T. Haviland was named as the only defendant. Its object was to have a certain sale of real estate on execution made November 20, 1889, declared void and set aside.

Anna K. Gilman was the judgment debtor and the then owner of the real estate, which consisted of three separate parcels, two in Waterville and one in Oakland. Mr Haviland was the judgment creditor and purchaser at the execution sale. The bill alleged in substance that Haviland first recovered a judgment in New York against Anna K. Gilman; that he entered suit on that judgment at the June term, 1888, of the Superior Court for Kenebec county, Maine; that notice of the suit was proved at the June term of said court, 1889, and an appearance was entered for the defendant by F. E. Southard, an attorney; that at the September term, 1889, Southard withdrew his appearance and judgment by default was entered; that Anna K. Gilman was of unsound mind and incapable of managing her own affairs at the time of said execution sale, and when the judgment was rendered, and that she was not represented in the proceedings by any guardian. It also alleged that Haviland obtained his judgment and had said execution sale made

with knowledge of the mental incapacity of the judgment debtor
and with intent to defraud her. There was a further allegation that a
part of said real estate was subject to a mortgage given by Anna
K. Gilman September 25, 1883, to the Waterville Savings Bank to
secure $2000, which mortgage the bank, under an arrangement with
Haviland, foreclosed, and thereafter, on December 6, 1897, con-
veyed its interest thereby acquired to him. The prayer of the bill was
that the sheriff's deed to Haviland be declared void and cancelled;
that he account for the rents, issues and profits of said real estate;
and that upon payment of the amount due on said mortgage the
same be decreed fully satisfied and the foreclosure proceedings there-
under and the deed from the bank to Haviland be declared void and
cancelled.

Mr. Haviland made full answer to the allegations of the bill,
denying the alleged incapacity of Anna K. Gilman, and all the
charges of misconduct on his part in the premises. Thereafter he
filed a plea in bar, alleging therein that Charles B. Gilman, who was
a brother of Anna K. Gilman, recovered a judgment against her
and caused the same real estate to be seized, sold and conveyed to
him on the execution issued thereon, all of which was done subse-
quent to the Haviland execution sale, and that Anna K. Gilman did
not redeem from said last execution sale, and, therefore, had no
interest in the real estate entitling her to maintain the bill. No
hearing appears to have been had on that plea.

Subsequently the plaintiff was permitted to file a new amended
bill which is the one now before the court. In this bill Charles T.
Haviland, Charles B. Gilman, Belle Gilman Tufts, Bell Gilman
Tufts, guardian of Charles B. Gilman, J. A. Stewart, Benjamin F.
Towne, Herbert M. Fuller, Dana P. Foster, Frank Redington and
Sophronia D. Redington are made defendants.

This bill contains the same allegations as in the first bill, and
adds, in substance, that Charles B. Gilman on August 10, 1888,
brought suit in the Superior Court for Kennebec county, Maine,
against Anna K. Gilman on a judgment recovered by him against
her in New York; that judgment was rendered therein and execu-
tion issued thereon July 16, 1891, upon which the same real estate
that was sold on the Haviland execution was seized and sold,
together with another parcel of real estate situated in Waterville,

and that the said Charles B. Gilman was the purchaser thereof at said sale and received a sheriff's deed thereof; that no notice of the Charles B. Gilman suit was given to her, and that she was then insane and incompetent to protect her rights and was not represented in the proceedings by any guardian; that Charles B. Gilman died testate April 24, 1893, having bequeathed and devised all his estate to his only child, Charles B., and his wife, Belle Gilman, now Belle Gilman ·Tufts, in equal shares; that the defendant Haviland, at different times since November 20, 1889, made conveyances to certain persons of portions of said real estate (each of said conveyances being specified in the bill, with its date, the description of the property conveyed, and the grantee or grantees therein). Those grantees now living are made defendants; and in the case of those deceased, their heirs or devisees are made defendants.

The prayer of the bill is, that the sheriff's deed to Haviland, and all deeds and mortgages made by him or his grantees be declared void and cancelled; that Haviland account for the rents, issues and profits of said real estate; that upon payment of the amount due on the mortgage to the Waterville Savings Bank satisfaction thereof be decreed·and the foreclosure proceedings thereunder and the deed from the bank to Haviland be decreed void and cancelled; that all the defendants be enjoined from conveying said real estate; and that the sheriff's deed to Charles B. Gilman be declared void and cancelled.

Belle Gilman Tufts for herself, and as guardian of Charles B. Gilman, filed disclaimers of any and all right, title and interest in the property. All the other defendants filed demurrers which have not been heard, and also made full answers.

The cause was heard before MR. JUSTICE SPEAR upon bill, answers, replication and evidence and, on November 24, 1914, he filed a decree dismissing the bill for the reasons stated in his finding of facts filed with the decree and referred to therein.

The only issue at the hearing, as stated by the Justice in his findings, was one of fact, whether Anna K. Gilman in November, 1889, had "sufficient mental capacity to enable her to comprehend ordinary business transactions and particularly the transaction here involved." Upon that issue the Justice found against the plaintiff. He filed a full statement of the grounds and reasons for his finding of facts,

discussing therein at some length the evidence that led him to his conclusion, which he thus expresses: "It is my opinion, therefore, upon all the evidence in the case, that the plaintiff during the years 1889 and 1890 was of sound mind to the extent of enabling her to understand any ordinary business transaction and particularly the transaction touching the defendant's seizure and sale of her real estate in Waterville on execution."

The first inquiry, therefore, is whether the decision of the single Justice in the defendants' favor on the merits of the cause should be reversed. If not it will be unnecessary to decide the other questions raised by the demurrers.

It is the settled rule in this State that the decision of a single Justice upon matters of fact in an equity hearing should not be reversed unless it clearly appears that such decision is erroneous, and that the burden of proving the error rests on the appellant. *Young* v. *Witham,* 75 Maine, 536; *Paul* v. *Frye;* 80 Maine, 26; *Railroad Co.* v. *Dubay,* 109 Maine, 29.

The record of this case covers 556 printed pages, and, therefore, it is not feasible to make here any detailed analysis or comprehensive review of the evidence presented. Some brief reference, however, to undisputed facts and circumstancs, and to the testimony relied on in behalf of the plaintiff, seems necessary.

In 1897 Anna K. Gilman was confined as a person of unsound mind in some institution in London, England. Ten years later her brother Frazier brought her back to this country. When she went to England does not appear. It was apparently between 1892 and 1897. Prior to her going to Europe, she had managed her business affairs in her own way, and they were of unusual importance. She was an executrix, with others, of the will of her father, Nathaniel Gilman, who died in New York in 1859, leaving an estate valued at about a million dollars. For quite thirty years thereafter she was involved in continuous litigation in the courts of New York and Maine in connection with that estate. A petition for an accounting by the executors was filed in the courts in New York in 1864, and the final decree thereon was not made until the year 1888. And she was also involved in much other litigation during that period and for several years thereafter. The evidence shows that she was inclined to litigation and was headstrong and ungovernable in prose-

cuting it, apparently to her own ultimate disappointment and financial embarassment.

As the time drew near when a decree was inevitable in the matter of her accounting she was disturbed and excitable. . By that decree, made in 1888, she was charged with a balance of about $40,000 to be paid by her to those entitled thereto under the will. She was then financially embarassed, and greatly harassed by the persistent efforts of those having judgments, and other claims against her, to collect them. Haviland recovered his judgment against her in New York in the early part of 1888. Immediately following the decree against her as executrix, her brother Charles B. Gilman brought his suit against her in Maine and attached her property.

Up to that time she appears to have had her home in the Gilman house at 265 Clinton street, Brooklyn. In the latter part of 1888 or early in 1889 she evidently undertook to conceal her whereabouts Frazier Gilman, her brother and guardian, testified that he did not know where she was and could not find her from about 1888 to 1897, when he learned of her confinement in London. The evidence shows · that in February, 1889, she went to Hartford, Connecticut, and that for the next two or three years and perhaps longer, she lived there, and in some other places in Connecticut and Massachusetts. A witness testified that the last time Miss Gilman visited her home in Wakefield, Massachusetts, was in 1892, and she thinks she then spoke of going to Europe. There is no evidence of where she lived, or what she did, from about 1892 to 1897.

Several witnesses testified in behalf of the plaintiff, as to her conduct, personal appearance and mode of life during a considerable period of time including the years 1888 and 1889. That testimony tends to show that she was naturally of a nervous and excitable temperament; that she pursued litigation with obstinate persistence, refusing to be guided by the advise of her attorneys, and insisting on having her ideas followed which as a rule resulted disastrously to her interests; that for a considerable time prior to June, 1888, when the final decree for accounting was filed against her as executrix, she seemed to be working almost continuously over her, accounts, and was then very nervous and easily excited; that she lived in comparative seclusion from 1888 on, especially after she went to Hartford, avoiding meeting people generally; that she

appeared to have little means, was poorly dressed, and lived inexpensively at different boarding houses; that her conversation with those whom she trusted was chiefly of her financial difficulties and her inability to extricate herself from them; that she seemed to believe that her brothers and other relatives had greatly injured her, and were pursuing her; and that she acted as if she feared she still was being followed and hunted by people. That testimony undoubtedly describes the conduct and appearance of an eccentric and erratic person. But the fact must not be overlooked that that testimony is the recollection of witnesses as to things done and said a quarter of a century ago. And the weight to be given to that testimony of the eccentric and erratic conduct of Anna K. Gilman during 1888 and 1889, as evidence that she was then insane, should be determined in the light of her then situation and circumstances. The evidence amply justifies the conclusion that she left New York and lived thus reclusively in and about Hartford because of a desire to avoid process servers, and to be secluded from those seeking to find her. The sitting Justice in his findings says: "She was in fact pursued by process servers, who served papers upon her, and probably by detectives, in order to locate her for the service of other papers. Her desire to conceal her identity and escape strangers was undoubtedly to avoid those official pursuers, and, to my mind, tended to prove a comprehension of what was going on rather than the presence of mental delusions. She was actually harassed and annoyed, as many other people have been, who have been for years the victims of the triumphs and disappointments of litigation, and was undoubtedly mentally harassed and annoyed in consequence. But nothing in the evidence is sufficient to establish the conclusion that in 1888 and 1889, her mental disturbance had actually gone beyond the degree of anxiety that would naturally result to any mind similarly situated."

We think it is a fact of significance that in none of the important litigation in which Miss Gilman was engaged in the courts of New York and Maine, both before and after the Haviland suit against her, was it ever suggested that she was mentally incapacitated and should be represented by a guardian. Her brother Frazier, the guardian, the only one of her relatives to testify in her behalf, and who testified that he thought she was insane in 1886 and then contemplated having her put under guardianship, was a party to a

petition, to which she was also a party, filed in the courts of New York for the sale of the Nathaniel Gilman homestead, and on which the homestead was sold to him in "1892 or 3." but no suggestion of her mental incapacity was made in that proceeding. Later, in 1896, he brought proceedings against her in the courts of Maine for the partition of real estate, and no suggestion was therein made that she was of unsound mind. Several business letters of Anna K. Gilman, written to the tenant of her property in Waterville, Maine, were introduced in evidence. Four of these were written in 1888, and six in 1889. Those letters do not disclose any trace of unsoundness of mind on the part of the writer. On the other hand they indicate a well ordered mind, comprehending clearly the business matters referred to, and disclosing a memory for business details of more than average power. No one, we think, can read those letters without being constrained to the conclusion that the writer of them was not then mentally incapacitated to manage her business affairs. Six of those letters were written while the Haviland suit in Maine was pending against her. One of her witnesses as to her mode of life and conduct while in Hartford, stated on cross-examination that Miss Gilman was "very bright and very good company." Another witness, speaking of her at that time, said "she was bright" and that she seemed well informed as to railroad stocks, advising the father of the witness to invest in a certain railroad stock.

Public policy requires that the judgments and orders of courts and the sales of property thereunder should not be lightly vacated and set aside upon a claim that the parties thereto were of unsound mind at the time they were rendered; especially after the lapse of more than a score of years during which other parties have acquired rights in the property involved. Such a claim must be established by proof that is clear and convincing.

We have not overlooked in our examination and study of this case, that evidence was presented tending to show that the property sold on the Haviland execution was of considerable more value than the judgment debt, and that it seems unreasonable that Miss Gilman, if she was not then mentally incapacitated, would have thus abandoned the property. But in this connection it is to be borne in mind that she was at that time apparently so deeply indebted on

other judgments and otherwise that there was no feasible way for her to save the property, and no object for her to redeem it from the Haviland sale.

Our conclusion upon the whole evidence is that it does not clearly appear that the decision of the sitting Justice dismissing the bill on the merits was erroneous.

*Appeal dismissed.*
*Decree below affirmed.*